UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LANE HOLDINGS, INC., <br><br> Plaintiff, <br><br> -against- <br><br> KLIGER-WEISS INFOSYSTEMS INC., <br><br> Defendant. | Civil Action No. 17-CV-06631 <br><br> **AMENDED COMPLAINT** |

Plaintiff Lane Holdings, Inc. ("Lane" or "Plaintiff"), by its undersigned counsel, as and for its Complaint against Defendant Kliger-Weiss Infosystems Inc. ("KWI" or "Defendant") alleges as follows:

## NATURE OF THE ACTION

1. This action asserts causes of action for breach of contract and declaratory relief, arising out of KWI's attempt to "hold up" Lane for more than $450,000 or face the instantaneous destruction of Lane's business.

2. Specifically, after Lane gave proper and valid notice of termination of the parties' business relationship (one-hundred-fifty two (152) days' notice effective April 1, 2018), KWI demanded to be paid in excess of $450,000 (that KWI is not properly owed) by November 14, 2017, or it will terminate service to Lane's entire software system, which will bring Lane's business to screeching halt, from which it will unlikely be able to recover.

3. Indeed, if KWI carries through on its improper threat, immediate irreparable damage will be caused to Lane's business operations. Court intervention and injunctive relief are therefore necessary to preserve Lane's business and the jobs of Lane's 280 employees.

4. In addition, Lane has paid KWI $30,000 for equipment that does not provide the functionality it was sold to provide and paid KWI service fees for services it never received.

5. Lane thus seeks and is entitled to recover the thousands of dollars in damages it has suffered for KWI's breach of warranties and misrepresentations.

## PARTIES

6. Plaintiff Lane is a Michigan Corporation, with its corporate offices and distribution center located in Plymouth, Michigan, which, through subsidiary entities, owns and operates 34 retail stores in three states, as well as national and international sales on its online sales platform.

7. Defendant KWI, is a New York Corporation, whose principal place of business is located in Greenvale, New York, who is a provider of cloud-based retail solutions including mobile point of sale, point of sale, merchandising, and merchant solutions and services.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) based upon the complete diversity of citizenship among the parties. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the KWI conducts business in this district and pursuant to the contractual agreement of the parties.

## THE RELEVANT FACTS

### Lane's Business, The Parties' Background and Agreement

10. Lane sells lingerie, romantic gifts, and other adult oriented merchandise.

11. Lane operates 34 brick and mortar retail stores in Michigan, Illinois and Indiana.

12. Lane also sells its products online through its website.

13. Lane has 280 employees and annual sales of more than $28 million per year.

14. In 2008, Lane engaged KWI to design and implement certain point of sale and back office operational system and software to be used to operate Lane's business.

15. Specifically, KWI sold to Lane a software system that is designed to facilitate point of sale transactions and payment processing, customer data collection, inventory management, supply chain management from vendor to individual store, certain IT services, enterprise content management (item master/catalog), enterprise resource planning, business intelligence, project management, collaboration, human resource management, track employee compensation for commissions and bonuses, enterprise application integration, enterprise forms automation, and point-of-sale hardware systems that integrate with the foregoing (collectively, the "System").

16. KWI implemented the System pursuant to an August 4, 2008 agreement with Lane (the "Agreement").

17. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

18. █████████████████████████████████████████████████████████████████████████████████████████████████████

**THE PILOT PROGRAM**

19. After the entering into and performing the Agreement, the System performed for several years to Lane's satisfaction.

20. From the inception of their business relationship, Lane timely made every payment owed to KWI for monthly fees.

21. On December 31, 2014, and on multiple subsequent dates, Lane and KWI had discussions about upgrading the System with a new "Cloud 9 Mobile Platform," which was a

3

more advanced version of the System that Lane had bought, allegedly had enhanced capabilities and was supposed to perform in a superior manner.

22. To that end, KWI sent Lane a September 14, 2015, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

24. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

25. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

26. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

28. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

29. 

30. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## THE PILOT LAUNCH WAS AN UTTER FAILURE

31. On or about October 2, 2015, Lane executed the SOW and the parties began preparations for the Pilot Launch.

32. Lane did not then, nor ever thereafter, execute any addendums or extensions to the Agreement.

33. Lane paid the $10,000 due upon execution of the SOW.

34. In November of 2015, the Pilot Launch was implemented in Lane's first store in Novi, Michigan.

35. However, at that time, Lane and KWI agreed to hold back the Pilot Launch for the two remaining stores, as Lane was nearing completion of two new stores in Battle Creek and Kalamazoo, Michigan because it made more sense to outfit those new stores with the new Pilot Launch equipment, rather than installing older equipment in them.

36. In January 2016, KWI completed the Pilot Launch in the new Battle Creek and Kalamazoo stores and KWI was thereafter paid the $20,000 Pilot Launch fee.

37. From the get go, the Pilot Launch was beset by problems.

38. The new equipment and software installed by KWI in each of the 3 Pilot Launch

stores never consistently worked, which remains true to this day.

39. To date, there have been 91 tickets opened through KWI's ticketing system for problems with KWI's MPOS equipment and software. The most recent ticket was opened on October 9, 2017. Also, Lane opened seven Bluetooth tickets for multiple problems with Lane's Bluetooth connection for the MPOS system devices.

40. Additionally, the manager at Lane's Novi store, the first pilot store to receive KWI's mobile point of sale platform ("MPOS"), has been completing fixes on her own without opening tickets with KWI's helpdesk. That same manager also supports the other two pilot stores and assists employees at those stores to rectify issues/problems without involving KWI's helpdesk. Thus, it is impossible to know exactly how many times issues have arisen during the pilot program.

41. As such, the Pilot Launch never went any further, Lane never paid the $127,762.50 for the 50% balance of the hardware (and KWI never made any demand to be paid that amount) and the parties spent the next year and half going back and forth attempting to resolve issues with the new malfunctioning equipment and software issues, including software issues not related to the launch.

42. Over the next several months, the parties exchanged an enormous amount of correspondence over the malfunctioning Pilot Launch equipment, and then later in the year began bi-weekly conference call meetings.

43. After several months, on May 20, 2016, Lane's Vice President Michael D. Allmond ("Allmond"), wrote to KWI's President, Sam Kliger ("Kliger") and said:

> The Scope of Work from October 2, 2015 is not accurate to the needs of our Company, nor have any of the performance deadlines been met by KWI. In addition, the SOW **is merely an authorization to proceed and is not a binding agreement or contract with Lover's Lane**, rather it documents how the parties expect to work together on a pilot program and then come to

6

> definitive terms based on the results of the pilot program. As you know, **the pilot program produced a number of issues that need to be addressed in any final agreement**.
>
> As noted in my emails of December 10, 2015 to Gary Brill and April 22, 2016 to Gary Brill and yourself, there were a number of changes that must be incorporated into a definitive agreement executed by both parties and including updated pricing that is agreed to, or not. Many of our requirements have not been addressed, and the necessary equipment has not been provided to us for testing, functionality or compatibility with our needs.
>
> \*\*\*
>
> KWI has not met the time deadlines, nor provided satisfactory equipment and software, both of which are material to our decision on whether to move forward or not.

(emphasis added.)

44. Thereafter, the parties continued discussing issues with the Pilot Launch equipment, but KWI continually failed to permanently correct the deficiencies and many of KWI's attempts were stop gap efforts.

45. Continually throughout the parties' correspondence, Lane made it clear that it would not proceed with further purchases until the issues with the Pilot Launch equipment had been corrected completely, the equipment and software showed continued signs of instability.

46. Specifically, on September 9, 2016, frustrated that none of the issues raised by his May 20, 2016, email had been resolved, Allmond wrote to Kliger stating, "…it is apparent to me that you have not taken my May 20th e-mail as serious as it was written and have asked my attorney to follow up with you on this matter."

47. In response, on or about September 9, 2016, Kliger wrote "In terms of your email on May 20th, I am concerned as I am not aware of any "issues" you are having with the software. Just the landscape and the stand…I promise to address them with your team immediately…the agreement we entered into was not a pilot agreement but for a rollout."

7

48.  That same day, September 9, 2016, counsel for Lane followed up and sent notice to Kliger that Lane was cancelling the SOW due to the failure of the Pilot Launch.

49.  On or about September 12, 2016, Allmond wrote, following up on Lane's counsel's letter,

> In reply to your e-mail, there is no point in getting on the phone. We have been on the phone since December 31, 2014 and feel we are no further ahead. In fact, we are so frustrated in dealing with this matter that we are about ready to give up in disgust. I have left an open door for you to get our pilot stores operating to our satisfaction. In order to do that, we need:
>
> - A quote from KWI for six replacement iPAD Airs, preferably in white and preferably the iPAD Air 2, so long as that model works with the KWI mobile *POS solution.*
>
> - Secondly, we need a quote for six wireless Bluetooth barcode scanners. In your last e-mail, you did not even provide us with the model name and number so we can independently consider the model KWI has selected.
>
> - Lastly, from our search, we have concluded that the Invue CT100 iPAD stand may resolve some of the functionality issues that were revealed when using the iPAD minis & stands KWI provided for the pilot stores.
>
> Should you prefer not to sell us the Invue stands, we are happy to buy them ourselves. Then we need to know iPAD Air 1 or Air 2.
>
> If KWI wants to retain Lover's Lane as a long term client, than the above needs to be addressed immediately.

50.  Allmond further made his position on the parties' relationship clear, "When we find we are satisfied with the three pilot stores. Lover's Lane will begin discussions for a new agreement with KWI. Until then, we will begin investigating the other options available."

51.  On September 12, 2016, Kliger wrote in response,

> I am trying my best to achieve a single goal. Making you, a happy referable KWI client. Your business is important to me, and I will do anything I can to achieve that goal, but I need your help. I am asking you again, for us to be able to communicate to better understand your needs and concerns. We have weekly conference

8

calls with your team regarding the mPOS project, and from my understanding, your team has not reported any outstanding issues. I am respectfully asking you to provide me with a list, so that I can address your concerns asap. (Even though Sam proposed weekly meetings in his letter, what actually occurred was bi-weekly meetings.)

52. On September 13, 2016, Allmond responded and authorized the purchase and delivery of $10,901 of new equipment to replace equipment installed during the failed Pilot Launch.

53. On September 15, 2016, counsel for Lane wrote Kliger, advising that Lane had decided to continue with the Pilot Launch as a result of the above September 13, 2016 and making it clear that if the Pilot Launch was ultimately successful, Lane would consider entering a new agreement with KWI for continued monthly service.

54. On September 21, 2016, counsel for KWI wrote to Lane's counsel, claiming that the SOW "constitutes a binding agreement between our respective clients, not simply an understanding for a pilot project, and it remains in full force and effect. There is no basis to cancel the agreement."

55. On September 27, 2016, Lane's counsel wrote KWI's counsel advising that Lane disputed and disagreed with the assertions in the September 21, 2016 and that was the end of the correspondence on the issue.

56. Over the course of the following year, October 2016 through October 2017, KWI continued to attempt, but totally failed, to remedy the issues with the Pilot Launch equipment which still never functioned properly, operated erratically and never became stable.

57. During that time, KWI never moved past any of the three Pilot Launch stores nor supplied any further products or software described in the SOW, including those on Schedule B.

58. On January 16, 2017, Allmond and another Lane representative attended a meeting conducted by Sam Kliger at the National Retail Federation Show in New York where

Kliger proceeded to show Lane the "all new" version of the KWI mobile MPOS that KWI planned to launch in the fall of 2017. Kliger claimed that this new version of the MPOS had many enhancements and fixes to their existing retail MPOS solution, again stalling for another eight to ten months.

### LANE TERMINATES THE AGREEMENT AND KWI ATTEMPTS TO HOLD UP LANE

59. On October 31, 2017, Lane finally could not bear KWI's failure to make the Pilot Launch viable any longer. ████████████████████████████████████████████████████████████████████████████████████████

60. The notice period was critical to Lane because Lane needed to transition the System to a new vendor and any interruption in service would catastrophically destroy Lane's business.

61. On November 2, 2017, KWI's counsel wrote a letter incredibly claiming that Lane had "no right to terminate" the Agreement because, he claimed, among other things, that the SOW was somehow "a five year extension of their earlier [Agreement]."

62. Further, KWI's counsel alleged that the Agreement remained in force until 2020 and that Lane would somehow owe KWI $1,389,950.53 if it proceeded with the termination of the Agreement and that there was also somehow $306,691.53 outstanding and currently due to KWI.

63. On November 6, 2017, Lane's counsel responded and advised that claim KWI's was without basis and that Lane intended to fully perform through the Agreement termination date of April 1, 2018 and that KWI was required to do the same.

64. On November 7, 2017, KWI's counsel wrote another letter, this time claiming that the amount allegedly owed to KWI had grown to $467,861.53 and threatening that if that

amount was not paid "by the close of business on Friday November 10, 2017...KWI will cease servicing the system installed in Lane's store's."

65. The threat of the shutdown of the System carried the prospect of immediate irreparable harm to Lane's business and required Lane to commence suit and seek injunctive relief.

66. After Lane advised KWI's counsel of its intentions to seek a temporary restraining order preventing the shutdown of the System, KWI's counsel extended KWI's "deadline" until Tuesday, November 14, 2017, because he was going to be out of town on November 9, 2017.

### KWI's Actions Threaten Immediate Irreparable Harm to Lane

67. The shutdown of the System is a breach of the Agreement that will cause immediate and irreparable harm to Lane.

68. All of Lane's stores and internet sales are linked together by the System.

69. Thus, immediately upon shutdown, Lane's cash registers and point of sale software will not work and customers in stores will not be able to complete transactions.

70. Furthermore, all accounting of Lane's sales will no longer be available.

71. Lane will further be completely incapable of managing its inventory and lose count of what has been sold in its stores, will not know what to purchase from vendors to re-stock product that has been sold and will lose complete count of its inventory.

72. Lane will also lose total capability to track its supplies and goods in transit.

73. Every purchase order for supply in Lane's system will no longer be available, Lane will lose all knowledge of what it has already purchased from vendors, when those goods are to be delivered and will suffer a total loss of inventory control.

74. The shutdown of the System also will completely shut down Lane's online sales.

75. The shutdown of the System will also cause Lane to lose all of its communication with new customers, including but not limited to its email blasts about sales and specials and items of interest.

76. Indeed, the shutdown of the System will bring Lane's business to a complete, grinding halt.

77. The timing of KWI's threat is especially damaging as it is now the holiday season (Christmas, New Year's Sale, and Valentine's Day). Sales between November and the end of February typically account for approximately 40% of Lane's total yearly sales.

78. The Shutdown of the System could also have devastating effects to Lane's 280 employees, as Lane pays salespeople and store managers commissions and bonuses, which would be completely lost and incalculable with the loss of data in the System.

79. Indeed, the shutdown of the System could cost these 280 employees their jobs, as the loss of goodwill with customers who cannot buy their products and debts incurred while Lane is completely unable to operate, could cause the complete destruction of Lane's business and cannot be compensated for by money damages.

80. KWI, on the other hand, would suffer no harm by the continuation of service of the System through April 1, 2018.

81. For nine years, Lane has paid KWI for every bill for operation of the System, will continue to do so until April 1, 2018 and is willing to pay for that period in advance provided KWI provides uninterrupted service through the termination period.

82. Injunctive relief is accordingly immediately necessary to prevent irreparable harm to Lane and should be granted.

**LANE'S DAMAGES AS A RESULT OF THE FAILED PILOT LAUNCH**

83. As mentioned above, Lane paid KWI $30,000 for equipment for three stores in

connection with the Pilot Launch.

84. However, on or about November 6, 2015 as part of the Pilot Launch, KWI did not deliver the equipment quoted in the SOW, but instead delivered to Lane used/loaner equipment from KWI as loaners to test and experience the KWI MPOS solution with.

85. The used/loaner equipment delivered was not the equipment quoted in the SOW, but KWI assured Lane of its functionality and Lane proceeded with the purchase.

86. The Pilot Launch proceeded at Lane's Novi store in November 2015.

87. On November 10, 2015, the MPOS in the Novi store crashed in the middle of a sale transaction.

88. On November 13, 2015, the MPOS crashed.

89. On November 16, 2015, the MPOS "kicked the user out."

90. On November 21, 2015, the MPOS "locked."

91. These types of malfunctions continued to occur on a regular basis in Novi and also in Lane's Kalamazoo and Battle Creek stores after those stores launched in January and February 2016.

92. Indeed, due to the frequency of errors and problems, Lane had to assign its "in-house" IT manager to fix issues with MPOS and the IT Manager often had to get involved when KWI could not remedy them.

93. Lane's IT and store staff were overwhelmed with the numerous MPOS problems and lost countless hours of productivity as a result.

94. KWI continually assured Lane that these problems would be remedied and, based upon those assurances, agreed to purchase 6 iPad Air 2, 6 wireless Bluetooth barcode scanners and 6 InVue CT 100 IPad stands to replace the used/loaner equipment KWI had supplied.

95. Lane agreed to purchase from KWI an additional $10,901 for equipment which

13

should have been delivered in the first place, in an attempt to improve the functionality of the system being utilized in the pilot stores.

96. The new equipment, however, fixed nothing and KWI's system continues to malfunction to this day.

97. Indeed, just recently Lane has experienced the following problems with the MPOS as part of the Pilot Launch:

- On September 16, 2017 - the MPOS in the Battle Creek store crashed upon using a gift card;
- On September 27, 2017, the MPOS in the Kalamazoo store froze in the middle of a sale transaction before it could be completed and caused the customer to leave the store;
- On September 30, 2017, the Kalamazoo store had multiple MPOS crashes when receiving debit cards, credit cards and scanning items;
- On November 18, 2017, the MPOS in the Kalamazoo store could not print receipts causing a customer to become angry and leave; and
- On November 27, 2017, the MPOS in the Battle Creek store froze.

98. Lane in fact has no way of knowing the total amount of money it has lost as a result of MPOS malfunctions because it is likely that many times malfunctions occurred which Lane did not catch and/or is not aware of.

99. The cause of all of these various problems, upon information and belief, is that the MPOS KWI sold to Lane, despite numerous representations to the contrary, was not market ready. The MPOS KWI sold to Lane simply could not perform what it was sold to perform.

100. In fact, Lane is in possession of information that other KWI customers experienced similar issues.

101. In addition to those types of daily malfunctions with the MPOS, since early 2015 there were also several major backoffice software failure events and on-going issues which caused Lane significant damage, including but not limited to:

- KWI kept Lane on an underperforming/antiquated server;

- missing data in traffic reports;
- open stock issues;
- register malfunctions;
- freezing of the system causing loss of data and lost hours of productivity;
- open stock replenishment malfunctioning and failing to provide accurate or any sales information at all;
- inaccurate reporting of year-to-date sales in open stock replenishment;
- failure of open stock replenishment to work at all because of KWI data traffic issues; and
- failure of the Daily Department Sales Flash Report to function.

102. Indeed, in one egregious example, KWI's backoffice software functioned so poorly, due to KWI's Promo Management help screen reverting back to an old help screen, the KWI system improperly initiated Lane's 2017 New Year's sale one day early, costing Lane $4,215.38.

103. As a result of "system freezes," data loss occurred over thirty different times and cost Lane hours of work and loss of employee productivity.

104. The open stock replenishment issues and inaccurate reporting problems were so serious and could have had disastrous consequences for Lane's business that if they had not been caught by Lane's employees who questioned the incorrect data and reports Lane received, Lane could have lost significant money.

105. KWI also made material misrepresentations to Lane concerning its ability to integrate with Lane's customer loyalty software, which tracked and maintained Lane's Customer Loyalty Reward Program ("Clutch").

106. KWI represented to Lane that KWI's system could integrate with Clutch and that it had integrated Clutch with at least two other KWI customers.

107. As a result, Lane spent $27,675 attempting to have KWI integrate Clutch with MPOS.

108. However, KWI was never able to integrate Clutch and Lane is now in possession of information that KWI's representations were false and it could not integrate Clutch for at least one of KWI's other customers.

## COUNT I
### (Breach of Contract)

109. Plaintiff repeats and realleges each and every paragraph set forth above as if fully set forth herein.

110. The Agreement is a valid and binding contract between Lane and KWI.

111. Lane has performed all of its obligations pursuant to the Agreement.

112. Lane duly and properly exercised its rights to terminate the Agreement pursuant to Section 9.1, which will terminate on April 1, 2018.

113. Accordingly, KWI is required to perform services under the terms of the Agreement until April 1, 2018.

114. KWI has breached and repudiated the Agreement by its threat to cease providing service to the System prior to April 2, 2018.

115. Lane has been and will be damaged by KWI's breach, which money damages will not be sufficient to compensate as described in paragraph 65 through 82 above.

116. On December 7, 2017, the parties agreed to enter into a stipulation whereby KWI will continue to provide Lane with services through April 1, 2018, to prevent irreparable harm to Lane and should be granted.

## COUNT II
### (Declaratory Judgment)

117. Plaintiff repeats and realleges each and every paragraph set forth above as if fully set forth herein.

118. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████

119. KWI erroneously disputes that, claiming that a 5-year extension of the Agreement was entered into by the execution of the SOW, which allegedly prevents Lane from terminating the Agreement until 2020.

120. Accordingly, an actual case or controversy exists between the parties as to Lane's ability to terminate the Agreement.

121. KWI's position is without any legal basis as the Agreement and SOW are entirely separate documents and nowhere in the SOW is there any agreement to a five year extension of the Agreement and in fact, such a notion is expressly refuted by the terms of the SOW itself as described in Paragraphs 22 through 30 above.

122. Indeed, Lane never signed "…an **addendum** for a five year extension of the [Agreement]," nor has KWI presented an addendum, and thus no extension was ever agreed to.

123. Moreover, even assuming KWI were correct and the SOW could somehow be construed as a five year extension of the Agreement, there is no language contained therein, or anywhere else, that "restarts the clock" ████████████████████████████████

████████████████████████████████

124. Accordingly, the Court should issue judgment declaring that Lane has properly terminated the Agreement, effective April 1, 2018 and that KWI is required to supply service to the System until that date.

### COUNT III
### (Breach of Warranty)

125. Plaintiff repeats and realleges each and every paragraph set forth above as if fully set forth herein.

126. When KWI sold Lane the MPOS pursuant to the SOW, it was warranted both

17

expressly and impliedly that it was fit for the particular purpose it was to be used for.

127. Indeed, KWI was informed and had reason to know of the purpose the MPOS was to be used for.

128. KWI breached its warranties to Lane that the MPOS was fit for the particular purpose it was to be used for, as the MPOS could never perform as warranted.

129. Indeed, Lane has now been forced to replace the MPOS entirely with equipment from a new vendor at a greater cost.

130. Accordingly, Lane has suffered damages as a result of KWI's breaches of warranty in an amount to be determined at trial believed to be in excess of $75,000 including but not limited to amounts paid to KWI for the MPOS, damages sustained as a result of MPOS failure and the difference in price between the MPOS and the new equipment Lane has been forced to purchase.

## COUNT IV
### (Fraud)

131. Plaintiff repeats and realleges each and every paragraph set forth above as it fully set forth herein.

132. KWI represents that the MPOS called for in the SOW was a market ready, "game changing" product at the time it sold the MPOS to Lane.

133. KWI also represented to Lane that it could "seamlessly" integrate Clutch with the backoffice software.

134. The above representations were false and known to be false when made.

135. Lane relied on KWI's misrepresentations to its detriment.

136. Lane's reliance was reasonable due to the parties' long business relationship and KWI's purported expertise in the field.

137. Lane has been damaged and is entitled to rescission of the SOW and return of all

18

monies paid to KWI pursuant thereto.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

1. Awarding Lane preliminary and permanent injunctive relief restraining and enjoining KWI from terminating service to the System until April 1, 2018.

2. Damages in amount to be determined at trial.

3. Costs.

4. Attorney's fees.

5. Such other and further relief as the Court deems just and proper.

Dated: December 15, 2017
New York, New York

MORRISON COHEN LLP

By: ___*Valerie Sirota*___
Edward P. Gilbert
Valerie Sirota
909 Third Avenue
New York, New York 10022
(212) 735-8600
egilbert@morrisoncohen.com
vsirota@morrisoncohen.com

*Attorneys for Plaintiff*
*Lane Holdings, Inc.*